Mr. Feldman? Good morning, Your Honor. Good morning. It's been a long time since we had a statute of frauds case. Yeah, I'm not sure it's indicated. It's your contract. Right, right. I can't remember the last time I mentioned the word black paper, either. Well, actually, it would help me if you could walk us through why we have offer acceptance and contract here, because that's the problem I'm having. Sure, Your Honor. I'd be happy to start with that. That, of course, is the contract formation issue. I think the best place to begin that is with the notion that we pointed out in our briefs. First and foremost, this is a summary judgment case. In both this case and the Nevada Supreme Court have made clear that contract formation is an issue of fact. That's what this Court said in the Southern California Painters case. But is that true where your client in the May 10, well, even earlier than the May 10 document, but had provided a specific form of acceptance which occurred at the end of the document, which is listed under boldheading, acceptance of the contract, and then provides signature lines for the seller and the buyer? Your Honor, I want to address that point specifically. That portion of the contract was crossed out. Right. And that aspect, that act of crossing it out, is at the very least ambiguous. It could mean what I think you're getting at. Well, it's both crossed out and then on the May 10 document it's not even signed. Well, the May 10 document is a different issue. Well, actually, it's not signed on the May 9 document, is it? Well, there isn't a May 9 document. Or whatever the earlier draft was. Let me start at the beginning, because I think this would help. Help me understand what happened. The initial offer was made on May 5, and that offer was submitted by Arian Poore through his real estate agent, who was a gentleman named Twaney, and it was given to Nelson and to their real estate agent, who was a gentleman whose name is escaping me right now. I know who you're talking about. Go ahead. And the offer was discussed on May 6, and it was rejected on May 6. So we have an offer that's made, and we have no acceptance at that point in time. And then what happens is that the offer is discussed on May 6 by telephone, and Nelson, with his real estate agent there, initials the changes that he proposes, things like changing the amount of the offer from $125 million to $130 million and making the extra amount non-refundable. He initials that. He crosses out, as I think you were getting at, this portion dealing with acceptance, and he sends it back through his real estate agent, who then congratulates Arian Poore and Nelson and says, this is a done deal. And the issue of the signature was, in fact, discussed, and the real estate agent for the defendants said, you know, we'll take care of that at escrow. And so what we have is a counteroffer, and the counteroffer is accepted. I'm looking at ER 509, which is the May 6 document, right, the purchase agreement which was faxed on May 6. And this is the one that you indicated earlier Mr. Nelson had blacked out the acceptance title. And I don't see any signatures there. So is it your position that his initials at the bottom of the page suffice in place of the line for the signature and the date, which is set forth above under the language and whereof seller, if I can read it, here unto his hand and seal as of the date written below? And there's nothing there. Yeah, and the authorities that we cite on that are very clear. We cite the restatement, which indicates very clearly, and I'm quoting, the signature of a memorandum may be made by any signal, symbol, made or adopted, intention, actual or apparent, to authenticate the writing as that of the signer. And, quote, initials may also be used. But why wouldn't the initials be put next to the X where it says the undersigned accepts the foregoing offer and agrees to sell the property? We also cited cases indicating that the signature can appear anywhere in a document, whether it's at the bottom or the middle. That's if there's no requirement in the document. There's no indication by the party drafting the document on how it's to be accepted. Nevada law is pretty clear on that point, isn't it? I think that the law is clear. But if you tell me here's my offer and here's how you accept it, and you set the parameters on how it's to be accepted, if that's not followed, it's not accepted. I would agree with that, Your Honor, but that's not our case. If we had a contract that says- Let me ask this question. Looks to me like we've got an offer. That offer was rejected because they wanted another $5 million and for the $2.5 million deposit not to be refundable. So that's a rejection. That's a counteroffer then, is it not? Yes, it is. Is that the way you're interpreting it? Yes, that's how we're interpreting it. And it is our contention that that counteroffer was accepted. And it was accepted- So- On the telephone. And it was accepted when airing for initial Nelson's changes. And it was accepted also orally when- So we now have an oral agreement, do we not? We have both in this case, Your Honor. Pardon? We have a written agreement, which is the May 6th facsimile, which Arianpour initialed and Nelson initialed. And then we have the conversation that took place also on May 6th where Ms. Lampman, the name that I was trying to get to- Yeah. Congratulated Arianpour and said this is a done deal. We haven't prosecuted this case as a oral contract case. We've prosecuted it as a written contract case. And getting back, Judge Hawkins, to your point about- Excuse me. Let me get that. At that stage, it seemed to me to be an oral contract unless you have some indication of a writing. And the writing that you have is the fact that it was then initialed by the other party? That's correct. That's it? That's in the record. It was initialed. Well, I know it's in the record, but is that the basis of there being a written contract? Yes, Your Honor. And that's what the district court held as well. And, you know, to the point being that this contract had this language on acceptance, what it didn't have was language that said this offer shall be valid if and only if it is executed as indicated below. That just doesn't appear in this document. And on summary judgment, we would submit, as the district court found, that that's enough to survive summary judgment. And, Wiley, this is- Well, I'm not so sure. As Judge Hawkins correctly noted in his question earlier, the Nevada case law says that if the parties provide a specific method, then you must strictly follow that method. And what I hear you arguing to us is that there's a variation from the method specified. You are trying to read into the method of acceptance parole evidence from oral statements that were made on the telephone and by Mr. Lampman when the document itself provides that the acceptance must be by written signature on page ER-509, and there's no signature and no date there. Right. And I guess what I'm saying, Your Honor, is that that is crystallizing, I guess, the disagreement that you and I are having, which is we don't concede that this contract, particularly with that language completely crossed out, requires that there be a signature in order for it to be accepted. And we have very clear case law indicating that initials are sufficient. And we have the Wiley v. Cook case- So what do you think that the legal effect is where --? And what was the language that was blacked out? What's the legal effect of Mr. Nelson blacking out the words acceptance of offer to purchase? I think the legal effect of that is that that is no longer part of this agreement. Or is it- Let me follow through on my idea about oral contracts and written contracts. We've got an offer that was submitted to actually Lampman and Nelson, and that was not accepted at that point because they made a counteroffer. And so that we have now a counteroffer that goes to your client. And the counteroffer is now actually an oral offer because it differs from what the offer that was submitted initially. So now we have a counteroffer and only, as I see it, was it submitted orally. No. An oral counteroffer. Now, then- It's a written counteroffer. Where is it a written counteroffer? It's in the pages that Judge Tolman was just referring to. The counteroffer, which was increasing the amount of the payment- Yeah. It's on ER 507, 508, 509. This is what was faxed back to Mr. Arienpour. And Mr. Nelson wrote in handwriting those changes, and he initialed them. And then that was faxed back to Arienpour. So it was a written counteroffer, which was then accepted when Mr. Arienpour initialed all of those changes and all of the payments. So we have a written agreement. So you're suggesting that part of Mr. Nelson's counteroffer was to delete the words acceptance of offer to purchase because he didn't want to indicate that he'd accepted in that manner? I would say, Your Honor, that that's an issue of fact. And that's what the district court held. That needs to be litigated. That's why, again, going back to Wiley v. Cook, the facts there were very simple. One party said there was a sham agreement. The other party disputed that. And the court said there was an issue of fact. You would agree that there cannot be an oral contract for the purchase of land under the Nevada statute of fraud? I would agree that. There are exceptions to that. It's just part performance. But I would agree with the point you just made. I'd like to reserve some time for rebuttal. Is that all right? You have about two and a half minutes? Yeah. Terrific. Thank you. Okay. We'll hear from the other side at this time. Mr. Kennedy? I have to admit that I haven't had so much fun reading a deposition in a civil case in a long time. It has nothing to do with the merits of this case. But it was interesting. Right ahead. Thank you, Your Honor. I'm Todd Kennedy on behalf of Wyckoff Newberg Corporation and International Smelting Corporation. May it please the Court. This case is about 66 acres of raw land along Las Vegas Boulevard, the strip in Las Vegas, Nevada, for a discussed purchase price of $130 million. Now, Nevada law, like contract law generally, establishes objective requirements that gives parties assurances, parties to a transaction, some assurance that they're not going to be found to have inadvertently formed a contract while in negotiations. And you can define those assurances in two broad categories. The first one, objective manifestations of assent by both parties in a manner contemplated by the agreement. That's what the Chautauquas case out of the Nevada Supreme Court is all about. The second category is an objective manifestation of the primary terms of the agreement in a written memorandum which is signed by the parties to be charged. Now, the reason this case can be decided on summary judgment, in our view, is because neither of those two objective manifestations of contract that are needed are present in this case. The district court focused on the second, the statute of frauds. I'd like to start discussing with discussing the first. So are you urging us to affirm on a different ground than the district court ruled? We are asking, well, wait, on both grounds. The statute of frauds certainly, we believe, has not been satisfied here. But we believe, as an alternative ground, there isn't a contract here. And I believe both are intertwined together, particularly in the facts of this case where you have, as you say, a contract. Why wasn't there an oral contract? Because the contract, the document, the precipitating document, and all the following documents, the May 5th offer, the May 6 facts, and even the May 10th, they all clearly contemplated that if a contract was going to be formed, it was going to be created through the writings. Mr. Nelson cannot hear. He is effectively deaf. So if he's going to communicate, it's going to be through the writings. So his testimony, as I understood it, was that those initials at the bottom of these a confirmation that he has reviewed the document that has been sent to him? Yes, Your Honor. What did you do with Mr. Feldman's argument that on ER 506 through 09, there are various handwritten interlineations which apparently Mr. Nelson affixed to the document? In the context of where you do have a specifically contemplated way of showing I am agreeing to sell this property, which has been pointed out already today. Specific language, X is for signature. The lines on each page at the bottom of the document clearly go towards identification of the pages that if the parties actually sign to form a contract, it identifies the pages. And it's the same purpose for the interlineations. That shows that he's seen that handwritten change. And if he should form the intent to actually sell the property, and he signs where the contract has specified, and these documents were all written by plaintiff below, 26 Beverly Glen. But under circumstances where they said we put those in there so all the sellers could sign to show they were selling the property. So it goes to the initials go to identification of what pages are part of this. If you see. The district judge in going through his order said there are lots of questions of fact with regard to whether there was a contract and agreement. It seems to me that's correct. We're talking about some of the things even as you're mentioning. What the district court said was, all right, even assuming there was a contract, it was not in writing as required by Nevada law. That's correct. That's correct. Although I would say that the decision by the district judge was that what the initials meant created question of fact for trial, except that you have this specifically contemplated way of creating a contract, signature after language saying, I agree to sell this property going to the aforementioned terms and conditions. Contracts, if there is any, first of all, Nevada Supreme Court should caucus. And most courts long ago got rid of subjective interpretation of objective manifestations. So when you look at where they stated this is where you sign and you have these initials, the district court, I believe, could have properly said, first of all, we interpret contracts and what the meaning of these initials among the bottom of the page against the drafter. They didn't mean acceptance. The drafter of the contract told us where we were going to sign to show acceptance. But, counsel, the odd thing, the odd fact here is Mr. Nelson's disability. I mean, I assume Mr. Feldman is prepared to call witnesses at trial who may be lawyers who negotiate and regularly represent clients in commercial real estate transactions or contracts, that the normal use of the initials is to both confirm that this page is part and parcel of the contract, but also that the parties have read the terms on that particular page, if there's ever litigation over whether they ever saw that term or understood what it meant. What we have here is a different variation with Mr. Nelson that is somewhat ambiguous as to what his initials signify, don't they? Isn't that right? I would disagree. I don't think it is. Because Mr. Nelson, Shatakis teaches us that when the parties have a specifically contemplated way of forming and entering into a contract, you have to have anything less than that has to be subject to no other reasonable interpretation. And here, as you've just stated, there is a reasonable interpretation. I've seen this page. That doesn't equate to I agree to sell my property for $130 million. Why doesn't why wasn't Judge Sandoval correct when he said that's a contested issue of fact that only a jury can resolve? I can't look at a set of initials and determine what it means. A jury, because, again, looking at and referring to the way Nevada law is applied, he may have had contractual intent, but he did not comply with the expressly provided way in the agreement to show intent and contractual assent. And in the Shatakis case ---- Well, how about Lampman calling and saying it's all one done? We now have an agreement. It's a normal agreement at this stage, in my view. But there is an agreement. And so isn't that a question of fact that we can't really determine or the district judge couldn't determine? Lampman is an interesting issue. First of all, he's been called Mr. Nelson's or the entity's real estate agent, but there isn't any fact in the record that indicates he is the agent for Wyckoff Newport International. He is Mr. Lampman's friend. But isn't he the intermediary for Nelson because of Nelson's disability? That was not ---- and, of course, we're talking about the statute of frauds and we're talking about legal authorization. But isn't that a question of fact as to what his authority was, what his relationship was? Not necessarily. That's why Judge Sandoval is saying there are questions of fact about whether there was actually an agreement or not. The only thing I can say is I know it wasn't in writing. And I would agree. There is no writing that satisfies the statute of frauds in this case. I would absolutely agree with that. Although, first of all, there has to be some fact to suggest that Mr. Lampman is actually an authorized agent. The statute of frauds talks about communications by a legally lawfully authorized agent. Well, to be a lawfully authorized real estate agent, there are some things that have to happen. And none of that, none of those evidence is here. On summary judgment, of course, you have to have some fact to make that conclusion as over and above speculation. Mr. Lampman was simply helping Mr. Nelson communicate because he couldn't speak on the phone. And let's not forget the May 5th document, even the May 10th document, which, of course, is an entirely new offer that changes some things around. You're arguing, as I understand it, you're arguing that the summary judgment that we can't determine whether there was an agreement or not is wrong, that he could have determined that there was no agreement? I believe he could have, yes. Now, how can you do that with all these factual questions? Well, all the documents that we're talking about, again, it's clearly that the parties intended to create the contract through the writings. And, of course, the writings all have an integration provision. Well, how do we know that? How do we know that? Well, when you have the express acceptance language and you have an integration provision in there that says all the oral things are not important here unless it's incorporated in this writing. So that by that, we have a pretty clear indication that the oral things were not intended to be part of an agreement. They were not intending to form an oral agreement. They were going to have a contract. Well, Mr. Lantman sure thought they were. Mr. Lantman thought it was a done deal that the ñ it was now an oral agreement. Well, Mr. Lantman's comments, he's not an authorized agent. He's not an employee of either of the two agencies. Well, how do we know that? How do we know what authority he had without going into all that? I believe it would be the burden of the plaintiff to bring some fact to cause that question. And there's nothing here besides Mr. Lantman was perhaps speaking. And that does not create lawful authorization. If they're going to ñ if we're going to go down that path, there has to be some showing that he has some basis to speak. At this point ñ I have a ñ I have an awful lot of difficulty why you're not trying to uphold the summary judgment on the basis that the district court rendered it. Well, let me turn to the court ñ Your Honor. I'll turn to that because my ñ I do intend to address that. So I'll turn to that now. We've got a couple of things. First of all, if what you have is an orally accepted counteroffer, of course, that does not satisfy the statute of frauds. There is not a writing that would help that there. What you do have is you have this May 6 fax that is initialed. Now, we have a couple of issues with that. First of all, it's not signed. And I would believe that although there are some initials on it to show identification of the pages, there still lacks a signature where the express writing says there needs to be a signature to say we formed a contract. If you look at the other ñ one of the judge's main problems with it is, of course, the description of the parties. You have two entities who own the property. Only one of them is named, by et al. Et al doesn't describe international. It means and others. Now, what you have ñ the appellant has referenced the restatement and the owner of Blackacre. Owner of Blackacre is a factual description. Et al. describes nothing. That is why you can't ñ you do not have in the circumstances of this case a document that adequately names the parties. Et al. does not point to international.  points to anybody. You could have 10, 20, any number of people that could fall under the definition of et al. Would you ñ if we agree with you and conclude that international is not bound by the contract, therefore, its 16 percent interest was not sold, what about Wyckoff's 84 percent interest? I would agree with the district court that this was a contract for the entire whole. It was ñ and you can turn to Beverly Glenn's own words, their own ñ their own broker, who said that he put lines on the page for all of the owners to sign. And Mr. Arienport testified, I didn't want part. I wanted it all. This was a contract intended to be formed for the entire. Wyckoff, when you look at the cases that discuss whether sometimes we'll enforce it in part ñ well, before we ñ first of all, before we get to partial remedies, we have to find a contract. We have to find something that satisfies the statute of frauds. You don't get there in this case. I don't want to burn up the ñ go back. What other points would you make under the statute of frauds? Under the statute of frauds. You've got signature. You've got identity of the parties. What other reasons? Those are the two reasons I would say that the case was correctly decided and dismissed under the statute of frauds. I don't believe part performance is an issue here, because the concept, of course, is when you have lack of an adequate writing, there's enough performance that you can ascertain the terms of the agreement. Here you have a trip to Las Vegas. Well, there are lots of reasons people go to Las Vegas. That is not specifically referable to the contract. But they usually take the cash to the casino, not to the escrow agent. True. But in this instance, that conduct is specifically referable to two different documents, two different contracts, May 6th, May 10th. When you have that, you cannot say which one we're operating under. And in that May 10th document, of course, itself appears to be a self-standing, another offer, different time frames, which itself is conduct that no one thought they had a contract here. They were just hoping they had a contract at some point. Turning back to you, you would also ask again, and I don't think I addressed it completely, was the idea of enforcing against Wyckoff. When you do see cases that do this, it's a specific performance cases. There are almost always a significant amount of performance in there. And, of course, it's always in an instance, at least in the cases I saw, for example, the Fleener, where there's been some misrepresentation. The party who purported to sell the whole didn't bother telling the other side that, oh, maybe I don't own all of it or maybe I don't have the authority to do this. That's not this case here. Beverly Glenn admits, Mr. Twain admits, ER 383 to 384. I knew there were other people. I didn't bother to go find out who they were, but we intended to have them all sign where I put lines for them to sign to get the entire contract. I see my time's almost up. If there's any more questions, I'd be happy to address them. I don't see any. Thank you for coming in today, counsel. We'll hear a rebuttal at this time. Thank you, Your Honor. There's a lot of ground to cover, and I'll try to do it really quickly. On the point of the initials, one thing I would just like to say very briefly is that Nelson signed as the seller. That's where he initialed it. It said seller's initials. On the issue of the et al., one thing that we have never heard in this case is who else that could possibly be, because if it's not international, if it's Microsoft, if it's Boeing, it's a fraudulent contract. It has to mean international. One point that my opposing counsel made is that this contract was written by the plaintiff below. But how do we know that without resorting to parole evidence? And as I understand it, you can't do that under the Nevada Statute of Frauds if it's not clear. All we know is the word et al. appears, which means others, but we can't tell from looking at the document who the others are. Your Honor, it's no different than the owner of Blackacre. Who's the owner of Blackacre? We don't know who that is without looking. In this case, it's Blackacre and Whiteacre, and one has 84 percent and the other has 16 percent. That's right. There are two owners, and there's a reference to et al. It has to mean something. But what El Ranco, this Court's decision, teaches us is that the parties know who the parties are. But this counteroffer. That's not good enough, as I understand the Nevada case law and statute of fraud. It must clearly identify the parties to the transaction, and this document doesn't do that. Yeah. I disagree with that. What the Nevada cases say is that it has to be reasonably certain. And if you look at cases like Hanneman and the other cases that we cite, when there is something in the contract, not nothing, but something, and that something is unclear, parole evidence can be used to identify what that something is. And that's what this Court held in El Ranco. The May 10 agreement. Would you agree that was true if there was a discrepancy within the document as to whether the purchase price was $125 or $130 million? Your Honor, we cited a case on that point as well, that one of the cases where I think Your position is that under Nevada statute of fraud law, you would be able to introduce parole evidence to show that, no, it was $130, not $130. If it was ambiguous, yes. If it said nothing at all, no. Okay. That's the line that the courts draw. And we cited one case, I think, where the purchase price was like $600 or more, and they admitted parole evidence. The May 10 agreement, one thing I just want to say very briefly about that is, at the time that Arianpour and Yasma traveled to Las Vegas, that agreement didn't exist. So this notion that they were performing the May 10 agreement is temporarily impossible. That document wasn't generated until they'd already gotten to Tycor Title's offices. And as you pointed out, there are a lot of reasons to go to Las Vegas. The money usually goes to the casino. Very rarely does $2.5 million go to an escrow company. And here But it really wasn't an escrow, was it? It was in the true sense that there were no escrow instructions ever written for the escrow agent, and the money was immediately withdrawn from escrow as soon as the seller sent a letter the next day repudiating any contract. The escrow instructions had been prepared, but they hadn't been executed. And the money was withdrawn. So we've got a different contract that's not signed. Well, that's completely irrelevant to the issue that we're talking about today. The issue that we're talking about today is the statute of frauds on the one hand, and if we get to it, the partial performance aspect on the other, it's our position that this Court doesn't have to even touch the partial performance. On that issue, the district court had one and only one reason for its ruling, and that was that part performance doesn't apply to written contracts. We've already established that to be wrong. So I think there's more work to be done there, too. Thank you, Your Honor. Thank you, Mr. Chief Justice. Thank you. Thank you. Thank you both sides for the argument. Very interesting case. It will be submitted for decision, and the Court will stand adjourned.
judges: Hug, Hawkins, Tallman